## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO


**UNITED STATES OF AMERICA,**

        Plaintiff

v.                                 No. CR 10-1374 MCA

**JEREMIAH JACKSON**

        Defendant.


### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Jeremiah Jackson's *Motion To Dismiss—Multiplicity* [Doc 49], *Motion To Dismiss Counts 2 and 3—Outrageous Conduct* [Doc 48], and *Motion to Suppress Involuntary Statements* [Doc. 47].  On April 20, 2011, the Court held an evidentiary hearing on Defendant's motions.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the motions based upon the following Findings of Fact and Conclusions of Law.

## I.    <u>FINDINGS OF FACT</u>

1.    Patrolman First Class Simmons has been with the Albuquerque Police Department (APD) for ten years.

2.      Officer Candis DeFrates has worked with the APD for 19 years.

3.      Officer DeFrates is currently a detective with the APD, but on April 6, 2010, she

        worked in the field services bureau.

4.      Officer DeFrates and Patrolman Simmons have been trained to monitor and

        operate  an Emergency Tracking System (ETS) unit.

5.      ETS officers are part of a robbery apprehension team, which works with banks to

        track bank robbers who abscond with money equipped with transponder tags.

6.      ETS equipment is kept in the ETS officer's patrol vehicle and the monitor consists

        of a small box and computer screen, which visually depicts "bars" representing

        signal strength and cardinal directions to orient the ETS officer to the signal's

        location.

7.      Ten "bars" on the ETS screen indicates that the tag (tracking device), along with

        the bank's money, is very close; fewer bars on the screen indicates that the tag is a

        greater distance away.

8.      When the tag is removed from the bank drawer with the money, ETS units in ETS

        officer's patrol vehicles are automatically activated, an alarm sounds, and the unit

        begins to display bars corresponding to the signal strength.

9.      Officer DeFrates has been an ETS officer for four to five years and had responded

        to at least 25 ETS calls, prior to April 6, 2010.

10.     On the morning of April 6, 2010, Officer DeFrates was in her marked patrol

        vehicle in a parking lot at Aztec and San Mateo, in Albuquerque, New Mexico.

11.    The ETS unit in Officer DeFrates' patrol vehicle gave an audible alert, and Officer Defrates began to move toward the signal, in the direction of San Mateo.

12.    On that date, Patrolman Simmons was on duty at the Northeast Substation when she was directed by dispatch to respond to an ETS activation for a possible bank robbery at the New Mexico Bank and Trust at 3002 Louisiana Boulevard.

13.    Dispatch confirmed that it was an actual robbery while Patrolman Simmons was driving toward the signal, several minutes after the initial alert.

14.    Dispatch reported that the suspect was armed.

15.    ETS officers are instructed to work together, using their equipment to find the location of the tag and money.

16.    Patrolman Simmons and Officer DeFrates communicated on a dedicated channel, referred to as "Admin 1," to locate the tag.

17.    Both officers also continued to monitor the general "Northeast Dispatch" channel.

18.    It was reported that the suspect vehicle was a dark blue mini van, with tinted windows and that the suspect was a black male in his thirties, wearing a blue baseball cap and a blue windbreaker.  [Gov. Exh. 2B at 2-3]

18.    Officer DeFrates initially advised Admin 1 that she was very close to the signal, that she had eight "bars," but she eventually lost the signal completely.

19.    Officer DeFrates testified that occasionally, the ETS unit inexplicably loses the signal, but that when that happens, the ETS officer continues on the original trajectory that was leading toward the signal.

20.     Patrolman Simmons communicated to Officer DeFrates that she was getting a

        signal and that it was getting stronger as she headed west on Commanche, toward

        Carlisle, which runs north/south.

20.     Officer DeFrates traveled west on Candelaria, also heading toward Carlisle.

21.     When Patrolman Simmons reached Commanche and Carlisle, she observed a blue

        mini van parked at a Circle R convenience store, and the ETS unit indicated that

        the tag was very close.

22.     Patrolman Simmons passed the Circle R and the ETS unit indicated that she had

        passed the tag as well.

23.     Patrolman Simmons made a u-turn at the intersection of Carlisle and Commanche,

        returned east on Commanche, passed the Circle R again, and parked her patrol

        vehicle out of sight near a park.

24.     Patrolman Simmons left her vehicle to retrieve her patrol rifle in order to begin

        setting up a perimeter on the Circle R.

25.     Patrolman Simmons testified that she had been informed that the suspect was

        armed, that she did not know what the suspect was doing in the Circle R, and that

        she did not want to create a hostage situation by blocking the minivan in the

        convenience store parking lot.

26.     Patrolman Simmons knew that Officer DeFrates was near by, and she chose to

        begin to set up a perimeter and await back up.

27.     Officer Defrates proceeded West on Candelaria, turned north on Carlisle, and then east on Commanche, maintaining communication with Patrolman Simmons.

28.     As Officer DeFrates traveled east on Commanche, she observed the blue minivan in the Circle R parking lot and she made a u-turn near Patrolman Simmons' vehicle.

29.     Officer DeFrates parked her police vehicle in an alley that runs behind the east side of the Circle R.

30.     Officer DeFrates testified that she was required to redirect a few children away from the Circle R and while her attention was focused on the children, the suspect got back into the blue minivan.

31.     The blue minivan backed out of the Circle R parking lot and headed west on Commanche.

32.     Officer DeFrates followed, activating her lights and sirens in order to clear traffic and because, based on the way the suspect was driving, She believed that he saw her following him.

33.     The minivan turned right on Carlisle and right at the next street, Palo Duro, and right again in the alley behind the Circle R, where Officer DeFrates had been parked.

34.     During this loop around the block, the suspect traveled at approximately 20 miles per hour.

35.   Officer DeFrates continued to follow because she believed that the suspected armed bank robber was present in the minivan.

36.   The minivan turned right back onto Commanche and then left, south, onto Carlisle.

37.   The minivan headed south on Carlisle, and Officer DeFrates followed approximately four car lengths behind because she expected that the minivan would hit a red light and the driver would abandon the vehicle.

38.   The minivan, however, did not hit a red light and continued traveling.

39.   During the pursuit on Carlisle, the suspect wove through traffic and at times he may have been going faster than the posted speed limit, which is between 40 and 45 miles per hour.

40.   Officer DeFrates traveled at a similar speed to keep up with the minivan.

41.   When Officer DeFrates informed Patrolman Simmons that the minivan was moving, Patrolman Simmons returned to her vehicle, in order to follow.

42.   Patrolman Simmons reached the intersection of Carlisle and Commanche, and was unsure about the suspect's direction.

43.   Patrolman Simmons decided to continue west on Commanche.

44.   Officer DeFrates advised Patrolman Simmons that she was pursuing the suspect down Carlisle and that they had just passed Claremont.

45.   Patrolman Simmons realized that the pursuit was behind her and to the south, but she could not turn around safely.

46.     When Patrolman Simmons reached the intersection of Commanche and I-25, she

        waited to hear the direction that the suspect took at the freeway interchange of I-40

        and I-25.

47.     Ultimately, Patrolman Simmons did not again make visual contact with the fleeing

        minivan, but she continued to follow, updating the NE Dispatch with Officer

        DeFrates' Admin 1 communications.

48.     At the intersection of Carlisle and Interstate 40 (I-40), the minivan entered the

        freeway and traveled West.

49.     Officer DeFrates followed, and as she entered I-40 behind the blue minivan, she

        alerted other units to their position and direction.

50.     During the pursuit on I-40, Officer DeFrates maintained the far left lane, while the

        blue minivan wove in and out of traffic, approximately 8-15 cars ahead of her

        patrol vehicle.

51.     The approximate speed of the vehicles on the freeway was 75-80 miles per hour,

        exceeding the speed limit of 65 miles per hour.

52.     Officer DeFrates testified that the minivan was weaving in and out of traffic on the

        freeway, but that she was able to maintain her lane and speed because the other

        cars were moving out of her way in reaction to her lights and sirens.

53.     Officer DeFrates was focused on the blue minivan, on driving, and on

        communicating with other units and did not monitor the ETS during the I-40

        portion of the pursuit.

54.     The blue minivan repeatedly moved to the right, as if to exit the freeway, but instead remained on I-40.

55.     Officer DeFrates remained in the left lane, in order to report any change in direction or exit from the freeway.

56.     The blue minivan rapidly made an exit at north Coors Boulevard and Officer DeFrates followed.

57.     The north Coors Boulevard exit forks into a right-hand lane, heading to the frontage road, and a left-hand lane, heading to north Coors Boulevard.

58.     Officer DeFrates lost sight of the minivan, and slowed to determine whether it was on the frontage road or on the exit to Coors Boulevard northbound.

59.     Officer DeFrates could not see the minivan on the frontage road, and therefore determined to take the Coors Boulevard lane.

60.     The Coors Boulevard lane is on an incline and once a driver crests the incline, she can see to the next intersection, Quail Road.

61.     As Officer DeFrates crested the incline, she saw the blue mini van in the far left lane of Coors Boulevard.

62.     Next, Officer DeFrates saw the blue minivan jerk to the right and get into the turning lane to turn right on to Quail Road

63.     At this time, Officer DeFrates was approximately 3/10 or 4/10 of a mile from the intersection.

64.     When the minivan turned onto Quail, it hit the curb and collided with a white sedan.  [Gov. Exh. 1, Camera 8, at 11:03:29]

65.     Approximately eight seconds later, Officer DeFrates arrived at the corner of Quail and Coors and saw the blue minivan stopped and smoking.

66.     Officer DeFrates saw a black male in a blue work shirt get out of the passenger side of the van and begin to run.

67.     Officer DeFrates left her patrol vehicle and chased the suspect, north through the Giant parking lot and east through an auto dealership to Corona.

68.     During the foot-chase, Officer DeFrates testified that she was not aware that the blue minivan had collided with another vehicle.

69.     In the Giant parking lot, the suspect went over a low wall, and when Officer DeFrates followed, she fell.

70.     Passers by informed Officer DeFrates of the suspect's direction, and she was advised that he was behind a residential house, in a backyard.

71.     Other officers had by now joined the foot pursuit and eventually one of those other officers apprehended and arrested Defendant.

72.     Agent Christopher Geiger has been an FBI agent since February 2009, and his first assignment was in the Albuquerque office, in the violent crime division.

73.     On April 6, 2010, Agent Geiger was called to assist Agent Jeffrey Romero in taking Defendant's statement.

74.   Agent Geiger first met Defendant in an interview room, after Defendant had been taken into custody.

75.   Agent Geiger had been informed that Defendant had been screened and cleared by a paramedic unit at the scene.

76.   Prior to the interview, Defendant was informed of his Fifth Amendment rights, Defendant read the rights back to the agents, signed a waiver form, and told the agents that he wanted to talk.

77.   Agent Geiger testified that Defendant did not appear to be under the influence of any substance and that he was articulate.

78.   For the first 30 minutes of the interview, Defendant narrated a version of events with little interruption at all from the agents.  [Gov. Exh. 5A (PART ONE)[1] at 00:00-30:29]

79.   Approximately 30 minutes into the interview, Agent Romero challenged Defendant's story by stating that the evidence did not support Defendant's story [Gov. Exh. 5A at 30:37-31:43]

80.   Agent Romero stated "So, you know, hey, hey, you know what, you want consideration.  You want me to—you gotta come clean.  If this accident occurred if you wrecked these people, you were on your own, you did it by accident

---

[1]  The interview recording is broken into two data files.  The first is approximately one hour, 20 minutes and the second is approximately 12 minutes.  The first segment is labeled "PART ONE" and the Court's findings following the recording chronologically to the second part, which is indicated as "PART TWO."

that—all right.  We can work through that.  But if you're gonna lie to me." [Gov. Exh. 5A at 31:15-31:31]

81.    Agent Romero continued to challenge Defendant's story with witness statements, and Defendant continued to defend his version of events.  [Gov. Exh. 5A at 31:43-35:41]

82.    Agent Romero then stated "This is—this is as serious as it gets.  Okay.  It's serious.  Two people are dead, are dead.  Their lives ended.  Over.  Okay.  And your kids are gonna know you're involved.  They're gonna know.  All  right. They're gonna know, all right.  They're dead.  There life is over.  Wherever it came from and went, it ended today. Today.  They are dead.  Okay.  You—now, you know, you're gonna have to take responsibility."  [Gov Exh. 5A at 35:43-36:21]

83.    The Court finds that this statement, from 35:43-36:21, by Agent Romero, was the only time that either agent raised his voice above a conversational tone.

84.    Defendant became emotional on learning that two people died in the car accident at Coors and Quail, but he maintained his story.

85.    Agents Geiger and Romero continued to press Defendant to tell the truth.

86.    Agent Geiger told Defendant that his "story is not adding up," based on the evidence gathered at that time. [Gov Exh. 5A at 37:00-37:17]

87.    Agent Geiger further told Defendant the following:

But we need you to tell us the truth.  You're not—you're not telling us everything.  You're really not.  I believe you're a good man and you're put in a bad situation.  And we see these kinds of things all the time.  And, Jeremiah, here's what happens.  All right.  There's two types of people that are involved in these robberies.  They're the monsters.  All right.  The people who prey on the innocent.  Who—just hear me out.  All right.  There's the mon—there's the bad people.  All right.  Bad people who just prey on innocent people and they cause these kinds of things to happen.

And then there's the other group.  All right.  Good people.  Hard working people who are put in tough times in bad situations and something goes wrong.  They're not a bad person but something happens.  And I wanna believe that you're one of those good people that you're not a monster.  And right now, everything's pointing to you being a monster, but I believe that you're not.  But I need you—in order for us to portray you in that as a good person that's in a bad situation, you gotta be honest with us, man.  [Gov Exh. 5A at 37:17-38:11]

88.    Agent Geiger told Defendant that this was his "opportunity to come clean."  [Gov

Exh. 5A at 39:09-39:12]

89.    The agents continued to present the evidence and Defendant maintained his story.

[Gov Exh. 5A at  39:12-41:33]

90.    Agent Geiger told Defendant "you can help yourself.  But the only way that you

can help yourself by talking to us.  And by openly honestly talking with us.  Right

now, you're telling us stories.  We don't need stories.  We need the truth, man.

We already have it.  But we need you to confirm it.  You're just digging yourself a

bigger hole."  [Gov Exh. 5A at 41:33-41:52]

91.    Agent Romero then said "Look, you can't avoid not being charged for felony

homicide.  You just can't.  You can't.  What you can do is mitigate it by

explaining, hey, look, it was an accident.  I never meant for that to happen.  I'm

sorry. Okay."  [Gov Exh. 5A at 41:52-42:05]

92.    This discussion continued and eventually, the topic turned to whether Defendant

would see his kids again.  [Gov Exh. 5A at 42:05-42:58]

93.    Agent Geiger said "We wanna help you.  We wanna make sure that you get time to

see your kids.  We wanna make sure that you have time to help them have the

father that they need.  But they need a father that's gonna be honest an that's

gonna tell the truth."  [Gov Exh. 5A at 42:59-43:07]

94.    The conversation continued along these lines, and Defendant maintained his

original story.  [Gov Exh. 5A at 43:07-47:25]

95.    After taking a break and accommodating a smoke request from Defendant, Agent

Geiger spoke alone with Defendant.  [Gov Exh. 5A at 47:27-47:35]

96.    Defendant asked for special consideration and Agent Geiger responded:


Let me tell you what we can do.  The way the legal system works
and I know you've been through it a little while.  You have the United
States Attorney's office.  All right.  They're the ones who–they're the
lawyers.  They prosecute, they, you know, go to trial.  They do all that.  On
our side, we do the investigations, that's all we do.  That's why when I was
telling you know what happened today.  We really do.  I'm not—I'm not
making that up.  They're the ones that—that can make plea deals. We can't
make plea deals.

However, we can recommend to them a course of action and that's
based on the value of the information that you can provide to us.

. . .

But we need to know about today first.  And we do any—we can't work with you at all until you open up and tell us everything about today.

And Jeremiah, I'm not kidding when I tell you, you know, we know what happened.  And we know the story you're telling us isn't the truth.  I'm not calling you a liar.  I'm calling you a man.  A good man.  Who's afraid for himself and for his kids right now.  I know you wanna see your kids.

. . .

And I know that's gotta be killing you inside.

. . .

But like we talked about earlier, it's more disappointing when people lie to you than when they do a bad.  You did a bad thing, all right.  Time to move past it.  Time to start being a man and take responsibility for it.

Jeremiah, can you tell me about what happened this morning?  And I want the true story.  [Gov Exh. 5A at 48:27-50:41]

97.    After this, Defendant began talk about the robbery. [Gov Exh. 5A at 50:57-53:13]

98.    Defendant stopped to ask whether he would be able to see his kids again.  [Gov Exh. 5A at 53:15-53:17]

99.    Agent Geiger responded:  "Again, that's going to be up to the Unite States Attorney's office.  But you're helping yourself now and you're putting yourself in a better place by telling us the truth."  [Gov Exh. 5A at 53:18-53:26]

100.   Defendant responded that he wasn't putting himself in a better place because Agent Geiger was "not telling me if I'm gonna see my kids again. . . ."  [Gov Exh. 5A at 53:27-53:33]

101. Agent Geiger said "I don't get to make that decision.  You're gonna get to see your kids again.  You will see your kids again.  A matter of when and where and how.  That's—that's to be decided.  And a lot of that's gonna be based on how honest you are with us.  And right now, you're being honest.  But you gotta tell me the truth, man.  Tell me if you were driving."  [Gov Exh. 5A at 53:33-53:54]

102. Defendant asked "How come you can't promise me?" [Gov Exh. 5A at 54:00-54:02]

103. Agent Geiger answered "I don't make those deals.  I'm an investigator.  I'm not a prosecutor.  By the time they talk to you, your opportunity to tell your story, I mean, this is it—this is your chance to get what you wanna say out."  [Gov Exh. 5A at 54:02-54:18]

104. Defendant then provided a second, different, narrative about the events of the morning.  Gov Exh. 5A at  54:18-1:14:40]

105. When Defendant reached the portion of the story relating to the accident, he stated that he didn't remember the accident.  [Gov Exh. 5A at 1:14:34-1:14:38]

106. Agent Geiger followed up by stating "be honest with me, Jeremiah, you were the only one in the car the whole time, right?" [Gov Exh. 5A at 1:14:38-1:14:56]

107. Defendant, crying, asked Agent Geiger, "What can you help me with?"  [Gov Exh. 5A at 1:14:57-1:15:08]

108. Agent Geiger responded "Jeremiah, all—all I can do is paint—tell your story.  That's all I can do.  I—I don't make bargains.  I don't make deals.  That's—not

that I don't want to.  I believe you.  I believe you're a good man.  But right now, all I can do is take your side of the story and tell your side of the story.  People wanna know that you're not the monster.  That you're a good person that was in a bad situation and an accident took place.  But you gotta tell me, man." [Gov Exh. 5A at 1:15:09-1:15:37]

109.  Defendant continued his story, saying "All I know is I drove really fast, I do remember getting on I-40." [Gov Exh. 5A at 1:15:37-1:15:46]

110.  After finishing the narrative, Defendant worried about how long he would be separated from his children, and Agent Geiger said, "I don't know how long its gonna be.  I can't make promises like that.  Like I said, I'm an investigator.  I'm not an attorney.  But what I'm telling you is you need to keep your mind right.  You need to focus on what's important to you and that's your kids.  Don't give up on everything.  You still got kids to live for.  You gotta be able to see them." [Gov Exh. 5A at  1:17:40-1:18:41]

111.  Soon after, Agent Romero returned to the interview room and began asking background questions relating to previous arrests, work history, and health.  [Gov Exh. 5A (PART TWO) at 00:00-5:06]

112.  Agent Romero asked Defendant about a knee injury sustained during the morning: "But your knee was hurt, right?"  [Gov Exh. 5A at 5:07-09]

113.  Defendant responded "I'm gonna be honest.  I didn't feel my knee until I—I had jumped over a fence.  And I fell and I couldn't—I couldn't run anymore.  I just

staggered and staggered and I just dropped.  The pain was just like excruciating."
[Gov Exh. 5A at 5:09-5:30]

114.   Later, describing his apprehension, Defendant stated that "they said, stay there.
And I did.  I didn't move and one of the cops grab me by the—by my shirt and by
my arm and just drug me and I stay there and one officer put his foot on my neck
when I—I was complying with him the whole time.  [Gov Exh. 5A at 6:18-6:39]

115.   Defendant continued, stating that "And they put me—and he put me in cuffs.  And
I just said, man, my knee.  I—can't—I can't—my knee's hurting really bad.  And .
. . or whatever they said.  And you know, they lifted me up and said, walk to the
car.  And I'm like, okay, okay, okay.  My knee's hurting.  Let me limp.  And I was
limping to the car.  And actually, the guy says, sit down for a minute.  So I sat
down.  Then he told me get up again.  I got up and they started walking to the car
which was like maybe 20 feet away." [Gov Exh. 5A at 6:45-7:14]

116.   The interview began at approximately 1:00 p.m. and ended at 3:00 p.m., lasting for
approximately two hours.

117.   During the interview, Defendant was well spoken, articulate, clear, and coherent,
and throughout the interview, he did not seek clarification of questions nor did he
indicate that he did not understand the proceedings.

118.   Defendant's thoughts were organized as he spoke to the agents.

119.   During the interview, Defendant recalled numerous specific details about his
children, his prior convictions, and the events of April 6, 2010.

120.   During the interview, the agents made no explicit threats or promises to Defendant regarding his children.

121.   Agent Geiger testified that Defendant mentioned that his knee was hurting a few times during their interaction.

122.   Defendant made no reference to *current* pain or physical distress during the recorded interview; his references or statements to knee/leg pain or other pain were made in the context of his commenting as to what had occurred earlier, at the site of his apprehension.

123.   I credit the testimony of Officers Simmons and DeFrates, and Agents Geiger and Romero.

124.   Defendant was charged by Indictment with one count of bank robbery under 18 U.S.C. § 2113(a) and two counts killing in the course of avoiding apprehension for bank robbery under 18 U.S.C. §§ 2113(a) and 2113(e).


## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Three substantive motions were addressed at the April 20, 2011 hearing.  Each motion is addressed in turn.

### A.    *Motion To Dismiss—Multiplicity* [Doc 49]

"Multiplicity is the charging of a single offense in more than one count."  United States v. Esch, 832 F.2d 531, 541 (10th Cir. 1987) (*quoting* United States v. De La Torre, 634 F.2d 792, 794 (5th Cir.1981)).  Multiplicity may become an issue where the same act

or transaction constitutes a violation of two distinct statutory provisions and also where

successive acts have been charged as separate crimes under the same statute.  Esch, 832

F.2d at 541.  Defendant argues that the *Indictment* suffers from both forms of

multiplicity—"same act" and "successive acts."

Although "multiplicity is not fatal to an indictment, it poses the threat of multiple

sentences for the same offense and may improperly suggest to the jury that the defendant

has committed more than one crime."  United States v. Morehead, 959 F.2d 1489, 1505

(10th Cir. 1992) (internal citations omitted).  The possibility of multiple sentences for the

same conduct implicates the Double Jeopardy Clause of the Fifth Amendment to the

United States Constitution.  Id.

**1.     Same Offense**

The relevant question in considering whether multiple counts address the same

criminal behavior, is "whether Congress intended multiple convictions and sentences

under the statutes."  Id. at 1506.  This Court first looks to the language of the relevant

statute and then to legislative history, in order to "discern Congressional intent regarding

multiple convictions and sentences."  Id.  If this approach does not reveal Congress'

intent, the Court applies "the well-settled 'rule of statutory construction' set forth in

Blockburger v. United States, 284 U.S. 299 . . . (1932), 'to determine whether Congress

has in a given situation provided that two statutory offenses may be punished

cumulatively.'"  Morehead, 959 F.3d at 1506 (quoting Whalen v. United States, 445 U.S.

684, 691 (1980)).  The Blockburger test is stated as follows:  "[W]here the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Morehead, 959 F.2d. at 1506 (quoting Blockburger, 284 U.S. at 304)).

Section 2113(a) states that

> [w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association . . . [s]hall be fined under this title or imprisoned not more than twenty years, or both.

The other statute at issue, Section 2113(e), mandates that

> [w]hoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

Defendant first contends that the three counts in the *Indictment* represent multiple charges for the same offense conduct. Specifically, Defendant maintains that the separate charges under Section 2113(e), for killing in the course of attempting to escape after bank robbery, target the same conduct as the basic bank robbery charge, brought under Section 2113(a). [Doc 49 at 3] He argues that Section 2113(e) operates not as a separate crime, but as a sentencing enhancement.

Our Circuit has explicitly rejected this view of Sections 2113(a) and (e).  In <u>Clark v. United States</u>, 281 F.2d 230 (10th Cir. 1960), the Tenth Circuit Court of Appeals determined that Congress, in enacting Section 2113(e), intended "to create a separate, distinct and more serious offense for which an additional and more severe penalty was authorized."  <u>Clark</u>, 281 F.2d at 233.  Thus, Congress intended "the imposition of separate and distinct authorized sentences" because "the crime of kidnapping to avoid apprehension is separate and distinct from the crime of robbery."  <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Gilmore</u>, 124 F.2d 537, 539, 540 (10th Cir. 1942) (evaluating whether "after appellant had been indicted, tried and found guilty in the former case of the crime of robbery of a national bank, he could not be prosecuted in this case under a separate indictment charging the killing of the officer in attempting to free himself and his associates from confinement" and concluding that "the indictment in this case charged a separate and distinct offense from that laid in the earlier indictment").

Indeed, our Circuit has recognized a distinct purposes for Section 2113(e):  while Section 2113(a) is directed at the crime of bank robbery, Section 2113(e) "was enacted to combat the multitude of murders and kidnappings occurring during attempts by bank robbers to flee the scene of the crime."  <u>United States v. Marx</u>, 485 F.2d 1179, 1186 (10th Cir. 1973).  Thus, in prior decisions, our Circuit has determined that the language and legislative history of the statute sufficiently reveal that Congress intended to create separately punishable crimes, and resort to the <u>Blockburger</u> test is therefore unnecessary.  <u>See</u> <u>Morehead</u>, 959 F.3d at 1506 ("If Congressional intent cannot be discerned, we apply

the well-settled 'rule of statutory construction' set forth in <u>Blockburger</u>. . ." (internal

quotation marks and citation omitted)).

Defendant cites contrary authority from the Third Circuit Court of Appeals and the

Seventh Circuit Court of Appeals, but this Court is required to follow Tenth Circuit

precedent in the absence of superseding authority from the Supreme Court of the United

States. <u>See</u> <u>United States v. Spedalieri</u>, 910 F.2d 707, 709 (10th Cir. 1990) ("The district

judge was bound to . . . follow Tenth Circuit precedent. . . ."). As a result, this argument,

that Section 2113(e) is merely a sentencing enhancement for Section 2113(a), must fail.[2]

## 2.    Successive Acts

Defendant also argues that successive acts have been charged as separate crimes

under the same statute. <u>See</u> <u>Esch</u>, 832 F.2d at 541 (explaining this multiplicity theory).

In this context, the "pertinent inquiry becomes defining the correct unit of prosecution."

<u>Id.</u> (citing <u>Bell v. United States</u>, 349 U.S. 81, 84 (1955) (explaining, in prosecution under

Mann Act, that if Congress does not fix "clearly and without ambiguity" the punishment

for a federal offense, doubt is to be resolved against turning single transaction into

multiple offenses)). "The inquiry as to what constitutes the correct unit of prosecution

---

[2] Despite this conclusion, it is apparent that even where separate convictions and sentences for those convictions are Congressionally authorized, Congress must also authorize consecutive sentences for those crimes. <u>See</u> <u>Whalen v. United States</u>, 445 U.S. 684, 690 (1980) (considering whether consecutive sentences were authorized for "rape and the killing of a person in the course of rape" which, under the relevant statutory scheme were "separate statutory offenses for which punishments are separately provided"). Such Congressional authorization for consecutive sentences is inferred where "each offense requires proof of a fact which the other does not," *i.e.* the <u>Blockburger</u> test. <u>Whalen</u>, 445 U.S. at 691-92 (internal quotation marks and citation omitted).

focuses in part on the identification of the key element of the federal offense." <u>Esch</u>, 832 F.2d at 541.

In <u>Esch</u>, our Court considered whether the defendants could be convicted for each of multiple photographs, when the photographs depicted the same two children and were taken during the same photo session. <u>Id.</u>  The "key element" of the child pornography statute was "the use [of] a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct." <u>Id.</u> at 542.  This determination was supported by the legislative history of the statute, which indicated that "Congress intended to protect children from the abuse inherent in the production of pornographic materials." <u>Id.</u>  The Court concluded that "[t]he fact that multiple photographs may have been sequentially produced during a single photographing session is irrelevant" because [e]ach photograph depended upon a separate and distinct use of the children." <u>Id.</u>

As has been explained, the purpose of Section 2113(e) is "to combat the multitude of murders and kidnappings occurring during attempts by bank robbers to flee the scene of the crime." <u>Marx</u>, 485 at 1186.  Based on this explanation for the statute, the key element of Section 2113(e) is that the offender "kills any person, or forces any person to accompany him without the consent of such person."  This is the statutory language that addresses the "multitude of murders and kidnappings," which the <u>Marx</u> Court identified as the primary concern of Congress.  As with the single photo session in <u>Esch</u>, the fact that two deaths occurred during a single car crash is irrelevant, because each victim was killed as a result of Defendant's alleged actions.

Defendant relies on Ladner v. United States, 358 U.S. 169 (1958).  In Ladner, the defendant shot two police officers but only discharged his weapon once.  Id. at 171.  Although arguably factually similar, the Ladner case stood on different legal footing.  The Court was "unable to read the legislative history as clearly illumining the statute with this meaning."  Id. at 174.  Apparently, in Ladner "[t]he history [was] scant, consisting largely of an Attorney General's letter recommending the passage of the legislation, and shed[] no real light on what Congress intended to be the unit of prosecution."  Id. at 174-75 (internal footnote omitted).  The Court determined that the statute "may as reasonably be read to mean that the single discharge of the shotgun would constitute an 'assault' without regard to the number of federal officers affected, as it may be read to mean that as many 'assaults' would be committed as there were officers affected."  Id. at 177.  To the contrary, in the present case, as has been repeatedly stated, the Congressional purpose in enacting 2113(e) was to prevent murders and kidnappings—to protect individuals.

Ladner was further concerned that "an interpretation that there are as many assaults committed as there are officers affected would produce incongruous results."  Id. This was because

> it will often be the case that the number of officers affected will have little bearing upon the seriousness of the criminal act [because] an assault is ordinarily held to be committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm.

Id.  In the case of 2113(e), the number of victims certainly affects the seriousness of the crime—recklessly killing in the course of escaping a bank robbery.  Unlike the statute in Ladner, 2113(e) cannot be reasonably read to disregard the number of victims.  Both the wording of the statute, "kills any person," and the legislative history of the statute point to the intention to punish for the number of victims and not for the number of car accidents.

Based on the foregoing analysis and findings, Defendant's Motion is denied.

**B.** ***Motion To Dismiss Counts 2 and 3—Outrageous Conduct*** [Doc 48]

Defendant argues that Counts 2 and 3 of the *Indictment*, brought pursuant to Sections 2113(a) and (e), should be dismissed because "under the totality of the circumstances of this case, the conduct of the police in conducting an unnecessary high speed chase through a heavily populated urban area is outrageous," and the "deaths of innocent bystanders or motorists [w]ere entirely predictable and foreseeable in these circumstances."  [Doc 48 at 3]  This argument, known as the "outrageous conduct"defense, is raised pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution.  United States v. Mosley, 965 F.2d 906, 908-09 (10th Cir. 1992).  Outrageous governmental conduct "generally prevents the government from prosecuting a crime developed through egregious investigatory tactics."  United States v. Lacey, 86 F.3d 956, 963 (10th Cir. 1996); see Mosley, 965 F.2d at 908 ("When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct.").

"'[T]his is an extraordinary defense reserved for only the most egregious circumstances.'"   United States v. Schull, 321 F.3d 1270, 1277 (10th Cir. 2003) (alteration in original) (quoting Mosley, 965 F.2d at 910).  Our Circuit has directed that "[o]utrageousness must be determined by reference to the universal sense of justice." Id. at 910 (internal quotation marks and citation omitted).  In order to evaluate such a defense, this Court considers whether, under the totality of the circumstances, "the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." Lacey, 86 F.3d at 964 (internal quotation marks and citation omitted).  "Defendants have the burden of proving outrageous government conduct. . . ." United States v. McKissick, 204 F.3d 1282, 1294 (10th Cir. 2002).  Despite the defendant's burden of proof, however, "the outrageous governmental conduct defense looks only at the government's conduct." United States v. Sneed, 34 F.3d 1570, 1577 Cir. 1994).

To establish outrageous conduct, "the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." United States v. Garcia, 411 F.3d 1173, 1181 (10th Cir. 2005) (internal quotation marks and citation omitted).  Defendant seems to focus on the "government involvement" prong of the analysis.  To that end, the government creates a crime "when there has been excessive governmental involvement in generating a new crime solely to prosecute it or in inducing a defendant to become involved in the crime for the first time, rather than merely interposing itself in an ongoing criminal enterprise."

Sneed, 43 F.3d at 1577.  Put another way, "[e]xcessive governmental involvement occurs when the government engineers and directs the criminal enterprise from start to finish and the defendant contributes nothing more than his presence and enthusiasm."  Id.  It is not, however, excessive governmental involvement "'to infiltrate an ongoing criminal enterprise' or 'to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity.'"  Id. (quoting Mosley 965 F.3d at 911).

Defendant takes the position that because the police had another means of locating Defendant (thorough monitoring the ETS unit), it was not necessary for Officer DeFrates to pursue him in a marked vehicle with sirens sounding and lights flashing.  As a corollary, Defendant posits that the deaths that resulted from the impact of the car driven by Defendant were predictable and foreseeable result of those unnecessary actions of the police.  Thus, according to Defendant, the act of pursuing Defendant with lights and sirens constituted outrageous governmental conduct that ultimately created the charged crimes—the deaths of the occupants of the white sedan, and that to hold Defendant responsible for the charged crimes violates the Due Process Clause.

The evidence presented at the hearing does not support an outrageous conduct defense, and I so conclude.  Officer DeFrates testified that early on, she lost the ETS signal.  The initial pursuit, around the block on Commanche, to Carlisle, to Palo Duro, and back to Commanche, took place at approximately 20 miles per hour.  Officer DeFrates testified that she activated her lights and siren in order to clear the intersection, as a safety precaution.  She further testified that she maintained a distance of

approximately four car lengths while traveling south on Carlisle, as she anticipated that Defendant would try to exit the vehicle if stopped at a light.  The Carlisle portion of the pursuit reached speeds of approximately ten miles an hour over the speed limit.

While on the freeway, she did not rely on the ETS unit because she was focused on driving safely, keeping Defendant in sight, and maintaining communications.  Further, although Officer DeFrates pursued Defendant's vehicle in the fast lane of westbound I-40, she followed from 8-15 car lengths behind Defendant and she testified that she was able to maintain her speed because the lights and sirens alerted other cars on the road to move aside.  Indeed, as Defendant exited the freeway at the Coors Blvd. off ramp, Officer DeFrates lost sight of the blue minivan and did not see it again until she crested the hill at the north Coors exit.  She was momentarily unsure about which lane of the exit Defendant took.  Officer Defrates was so far behind that she did not witness the collision, but instead arrived upon the scene to discover the smoking minivan and to witness Defendant exiting his vehicle and running from the scene.

Our Circuit considered the outrageous conduct defense in <u>United States v. Worthon</u>, 520 F.3d 1173 (10th Cir. 2008).  In <u>Worthon</u>, the defendant was initially stopped for following another vehicle too closely.  <u>Id.</u> at 1175.  The defendant argued that stop was not justified because his distance from the vehicle in front of him was artificially decreased when the police vehicle in front of him slowed its speed.  <u>Id.</u> at 1181.  Thus, the defendant argued that the police outrageously created the traffic infraction that led to the stop and the ultimate discovery of drugs.  <u>Id.</u>  The <u>Worthon</u> Court concluded that the

defendant could "point only to [the officer's] slowing down as the 'but-for' cause of the offense, which [did] not approach excessive government involvement in the creation of the violation." Id. The officer's desire to avoid tailgating the truck in front of him—the cause for the police vehicle's decrease in speed—could not form the basis for outrageous conduct and did not shock a universal sense of justice. Id.

In the present case, the evidence adduced at the hearing demonstrated that the crime was not created by the pursuing police officer. Officer DeFrates maintained a police presence, but she did not pursue Defendant in such a way as to cause him to lose control of the vehicle he was operating. Presumably the lights and sirens were designed to induce Defendant to stop his vehicle—not to travel at higher and more dangerous speeds. Despite the existence of the ETS unit, it is neither outrageous nor unreasonable for the police to want to maintain visual contact with a suspected bank robber who was reportedly armed—especially given the testimony from Officer DeFrates that the ETS unit lost its signal at one point early during the pursuit. Just as the Worthon defendant could have slowed down to maintain a safe distance, Defendant could have pulled over, could have slowed down, could have chosen not to jerk from the far left lane of Coors to the right in order to turn onto Quail, and thereby could have prevented losing control of his vehicle and colliding with a stopped car.

Based on the foregoing analysis and findings, as well as the findings made on the record at hearing, Defendant's *Motion* is denied.

Page 29 of  36

**C.**     ***Motion To Suppress Involuntary Statements***   [Doc 47]

It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona,  384 U.S. 436, 444 (1966).  Those procedural safeguards are such that "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.  Before Miranda is applicable, two requirements must be satisfied: (1) the suspect must be "in custody;" and (2) the questioning must meet the legal definition of "interrogation." United States v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003).

A defendant may waive his Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.  Whether a defendant has waived his Miranda rights "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks and citation omitted).  Waiver is a two-part inquiry:  (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v.

Spring, 479 U.S. 564, 573 (1989) (internal quotation marks and citation omitted) (Spring).  "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Id. (internal quotation marks and citation omitted).

Defendant does not contend that the police officers failed to advise him of his rights pursuant to Miranda.  Instead, Defendant argues that his waiver of those rights was involuntary because he was injured—both by the accident and the police—at the time he made incriminating statements and because he was subjected to a "prolonged emotional onslaught" by the FBI.  [Doc 47 at 3]  A waiver is involuntary only if the interrogating agent "took unfair advantage of [the] defendant's traits or the surrounding circumstances."  United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir. 2008) (alteration in original) (internal quotation marks and citation omitted).  The relevant factors include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment."  Id. at 1262.  Defendant makes no argument regarding the first, the second, or the fourth factors.  Thus, the Court considers the third and final factors in order to evaluate whether Defendant made an "uncoerced choice" to waive his rights.  Spring, 479 U.S. at 573.

Beginning with the final factor, Defendant maintains that he was in physical pain due to a leg injury sustained in the accident and because he was "subdued during arrest by an officer putting his foot on [his] neck." [Id. at 1]  In order to establish that his confession was involuntary, Defendant must demonstrate that the police engaged in coercive activity.  See Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); United States v. Erving L., 147 F.3d 1240, 1249 (10th Cir. 1998) ("[I]t is clear after Connelly that a confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will.").  Put another way, Defendant must show not only that he was in pain but that the officers took unfair advantage of that pain in order to secure a confession.  See United States v. Morris, 287 F.3d 985, 989 (10th Cir. 2002) (observing that a defendant's "mental capacity—as affected by pain, the effects of pain medications, and the post-traumatic stress of being shot—is relevant" to voluntariness, but not dispositive).

Agent Geiger testified that he and Agent Romero were informed, prior to questioning Defendant, that he had been examined and cleared by medics at the scene. Further, although Agent Geiger testified that Defendant mentioned to the agents that his leg hurt, this Court's careful listening of the recording discloses that Defendant made no reference to *current* pain during the recorded interview.  Specifically, the recording of the

interview revealed no indication that Defendant was in pain, was confused, or was disoriented or under a state of distress.  When Defendant asked for a break in order to smoke, the agents took him outside to accommodate him.  Defendant has not offered any argument or inference that the agents coerced his inculpatory statements by refusing to provide medical care, inflicting injury in order to secure information, or taking any other action or threat with respect to his physical comfort.  See United States v. Lopez, 437 F.3d 1059, 1066 (10th Cir. 2006) ("Moreover, there is no evidence that the agents withheld his medication in an effort to coerce [the defendant's] confession or took any other actions to use [the defendant's] injuries to coerce his confession." (internal quotation marks and citation omitted)); United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) ("There is nothing in the record to suggest that either one of them was mistreated, coerced, or lacked the capacity to understand his rights which he could have exercised any time during the interrogation had he chosen to do so.").

Turning to the third factor—the length and nature of the questioning, Defendant contends that during the two-hour interrogation, FBI agents told him that he needed to confess so that he would not be "viewed as a monster," so that he would receive "consideration," and so that he would see his children.  [Id. at 1-2]  "When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt."  United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002) (internal quotation marks and citation omitted).

Nevertheless, limited assurances that a suspect's cooperation will be made known to the

prosecution have been held to be "permissible interrogation tactic[s]." Lopez, 473 F.3d at

1065.  The Court has found that the agents made no threats or promises to Defendant.

Vague references to "consideration" did not deprive Defendant of "his ability to

make a rational choice."  United States v. Roman-Zarate, 115 F.3d 778, 784 (10th Cir.

1997).  When Defendant asked for consideration, Agent Geiger specifically stated that

> Let me tell you what we can do.  The way the legal system works
> and I know you've been through it a little while.  You have the United
> States Attorney's office.  All right.  They're the ones who–they're the
> lawyers.  They prosecute, they, you know, go to trial.  They do all that.  On
> our side, we do the investigations, that's all we do.  That's why when I was
> telling you know what happened today.  We really do.  I'm not—I'm not
> making that up.  They're the ones that—that can make plea deals. We can't
> make plea deals.
> . . .
> However, we can recommend to them a course of action and that's
> based on the value of the information that you can provide to us.

[Gov Exh. 5A at 48:27] Defendant asked for promises, but Agent Geiger refused, saying

"I don't make those deals.  I'm an investigator.  I'm not a prosecutor.  By the time they

talk to you, your opportunity to tell your story, I mean, this is it—this is your chance to

get what you wanna say out."  [Gov Exh. 5A at 54:02-54:18]

The agents undoubtedly played on Defendant's motions.  In doing so, however,

they "exercised [their] right[s] to manipulate the encounter." Id. at 784 (concluding that

an interrogating officer "exercised his right to manipulate the encounter" with the

defendant but did not deprive him of the "ability to make a rational choice").  The

evidence shows that the agents made no threats or promises, nor does the recording or

testimony demonstrate that Defendant was emotionally manipulated to the extent that he could not make a rational decision.  To the contrary, although Defendant was at times emotional during the interview, he repeatedly demonstrated that he understood what had happened and what was happening.  See United States v. Brown, 540 F.2d 1048, 1053 (10th Cir. 1976) ("The record does not reflect, viewing the evidence in the light most favorable to the Government, as we must, that Brown's confession was the result of any lies, promises or tricks."); see also United States v. Sablotny, 21 F.3d 747, 752 (7th Cir. 1994) ("[T]he police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible.").  Defendant struggled with his choice and was distraught about the consequences.  He asked for promises and reassurances, but the agents refused.  Despite receiving no assurances, Defendant recanted his first rendition of events and provided a different, more detrimental version of the story.

Considering the totality of the circumstances, the agents did not coerce Defendant into making an involuntary confession.  Defendant's personal characteristics did not predispose him to manipulation.  In fact, according to the Government, he had previous arrests.  The interrogation lasted two hours, and Defendant does not contend that the detention was impermissibly long.  Although the agents manipulated the encounter, there is no indication that Defendant was emotionally manipulated to the extent that he could not make a rational decision.  There is no dispute that Defendant was advised of his constitutional rights.  Finally, the evidence does not suggest or establish that Defendant

was subjected to physical punishment because (1) Defendant was examined by medical professionals prior to questioning, (2) Defendant indicated that he could participate in the questioning, (3) Defendant gave no sign, nor did he express, that he was suffering physical pain during the interview, and (4) the agents did not use Defendant's purported physical discomfort or the threat of physical harm to coerce him into making a confession.

Based on the foregoing analysis and findings, as well as the findings made on the record at hearing, Defendant's Motion is denied.

## III.   CONCLUSION

For these reasons, and the reasons stated on the record at the April 20, 2011 hearing, Defendant's *Motions* are denied.

**IT IS THEREFORE HEREBY ORDERED** that Defendant's *Motion To Dismiss—Multiplicity* [Doc 49] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion To Dismiss Counts 2 and 3—Outrageous Conduct* [Doc 48] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion To Suppress Involuntary Statements* [Doc 47] is **DENIED.**

**SO ORDERED** this 29th day of April, 2011, in Albuquerque, New Mexico.


M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE